Louise De Carl Adler, JUDGE
Sol Acceptance, LLC ("SOL") objects to confirmation of the chapter 13 plan of Ricol and Kimberly Royal ("Royal") on the ground that the so-called "Hanging Paragraph" of 11 U.S.C. Section 1325(a)[1] prohibits bifurcation and reduction of its secured claim. Royal opposes the objection, arguing that he acquired the vehicle for business; not personal use, making the Hanging Paragraph inapplicable. At issue is whether Royal's vehicle was "acquired for the personal use of the debtor" as it is construed under the Hanging Paragraph, in which case SOL's claim may not be bifurcated. There is no controlling authority in the Ninth Circuit defining what constitutes a vehicle "acquired for personal use."
The Court has jurisdiction to determine this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(L). The following are the Court's findings of fact and conclusions of law as required by Federal Rule Bankruptcy Procedure 7052, made applicable to contested matters by Federal Rule Bankruptcy Procedure 9014.
As discussed more fully below, the Court concludes that after considering the totality of the circumstances, Royal does not carry his burden of proving the vehicle was acquired predominantly for business use with his personal use being merely incidental. For that reason, he is not exempt from application of the Hanging Paragraph and may not bifurcate SOL's claim. SOL's objection to plan confirmation *57 will be sustained and the chapter 13 plan denied confirmation and the case dismissed.
I.
FACTUAL BACKGROUND
On June 11, 2017, Royal filed a petition under chapter 7 of the Bankruptcy Code and later converted his case to one under chapter 13. In his amended schedule A/B, Royal lists a 2011 Infiniti G37 with 60,000 miles valued at $9,000.00 (the "Vehicle"), derived from a Carmax purchase offer taking into account a prior accident. [ECF No. 43-2] Further, his amended schedule states that the Vehicle was "purchased to be used by debtor in his profession as a recruiter, for which he would have to drive to meet clients and impress them with his vehicle." SOL has filed a proof of claim for $27,946.79 fully secured by a lien on the Vehicle. [POC No. 3]
Prior to Royal's bankruptcy petition, Ricol Royal was employed as a "full desk executive level recruiter (headhunter) within the oil and gas pipeline, aerospace, and structural engineering" industries. [R. Royal Decl., ECF No. 68-3 at ¶ 2] His work involved visiting potential placement candidates and attending lunches and dinners with CEO's and hiring managers of Fortune 500 companies to persuade them to retain his services to fill executive level vacancies at their organizations. [Id. at ¶¶ 3-4] According to Royal, the Vehicle was an essential component to that process. [ Id. at ¶ 5]
Under the terms of the initial chapter 13 plan, Royal proposed to bifurcate SOL's claim by paying SOL $9,000 over the life of the plan on its secured claim without interest; the remaining balance on its claim would be treated as unsecured and receive no distribution. [ECF No. 44, § 3.2.2] Subsequent to the initial chapter 13 plan, Royal filed a first and second amended plan. [ECF Nos. 58, 70]. SOL's treatment was changed slightly under those amended plans to add 7.0% interest on the distributions to its secured claim under the plan. All versions of Royal's chapter 13 plan will be collectively referred to as the "Plan."
At an evidentiary hearing on SOL's objection to confirmation, Royal offered evidence and extensive testimony about his Vehicle search and the circumstances surrounding its acquisition, his job duties, and the Vehicle's role in performing those duties.
The evidence at trial is that on June 6, 2015, Royal signed a retail purchase contract with Carmart, LLC to purchase the Vehicle. [Trial Ex. 2] He also signed a credit application to finance its purchase. [Trial Ex. 1] Royal's uncontroverted testimony is that he negotiated the purchase and financing of the Vehicle over the phone, telling the salesperson that he was looking for a business class vehicle, preferably an import, preferably black, with leather interior. He was looking for a vehicle that was more "upscale." He told the salesperson it was for business use in his job as an executive recruiter in that it would be used for entertaining clientele and candidates to be hired by Fortune 500 companies. [Trial Tr. Apr. 11, 2018, Pg. 12:6-12] He testified that he wanted a vehicle that could create "a persona" that he was a successful recruiter who could be trusted with the substantial retainer he would be asking them to pay up front.
Royal further testified that when the salesperson located a vehicle with the correct specifications and arranged the financing, Royal traveled to the dealership to sign the paperwork that had been prepared from information he had provided over the phone. [ Id. at Pg. 9:23-28] Royal testified that all the paperwork was ready for his signature when he arrived to pick *58 up the Vehicle. In the section titled "Primary Use for Which Purchased," the purchase contract contained pre-printed language stating that the Vehicle was being purchased for "[p]ersonal, family or household [use] unless otherwise indicated below." The box below to designate the use as "business or commercial" was left unchecked. [Trial Ex. 2] Royal testified, without contradiction, that he questioned the salesperson about this section and was told that if he were purchasing the Vehicle through his business or company, the box could be checked; otherwise, it was considered a personal purchase. [Trial Tr. Apr. 11, 2018, Pg. 14:4-14] Taking the salesperson at her word, Royal completed the transaction without altering the contract. [ Id. at Pg. 14:14-16]
Royal testified extensively about his job duties at Newport Group where he was employed at the time of the Vehicle's purchase. He started with Newport in August 2014 in the oil and gas pipeline field. At the beginning, he was mostly tethered to his desk, telephone and computer attempting to find candidates for placement or find companies seeking employees to fill these high level positions. When the oil and gas industry suffered financial collapse, sometime in May, 2015, he and his employer decided to shift his duties to aerospace and structural engineering placements. That shift changed the nature of his duties from full-time in-office work to, essentially, half in-office work-emails and phone calls, computer searches, etc.; and half out-of-office work-making office visits to potential candidates, taking them to lunch or visiting the executive assistants of the hiring managers, trying to secure appointments with their bosses. [ Id. at Pg. 50:25-28; 51:1-7]
Royal testified that it was when this shift in responsibilities occurred, he determined he needed a better vehicle to perform his new duties, which included transporting potential candidates or executive assistants to lunches, dinners and other outings. [ Id. at Pg. 51:9-12; 51:19-20] In June, 2015, Newport agreed to loan him $3,000 at 0% interest, to be repaid by withholding a portion of his commissions until paid in full. The loan agreement states: "Employee understands that this is not compensation but is a personal loan extended by NSS for Employee's personal reasons. " [Trial Ex. H (emphasis added) ] Royal used the loan for a down payment on the Vehicle.
Although Royal testified at length about his efforts to generate new business, unfortunately, the new Vehicle was not much assistance in generating new placements. Faced with a declining draw from Newport, in November, 2015, he left Newport and joined Cyber Coders, an executive recruiter in Irvine, CA. Then Royal's circumstances took a drastic change: In March, 2016, his Vehicle was rear-ended while stopped in traffic on the freeway and he suffered serious neck, spine and head injuries. As a result of the accident, Royal was and is unable to work because he is unable to sit at a desk and work at a computer or drive to make sales calls. He is subsisting on County Cash Aid and gifts from family and friends. He is living rent-free with relatives, and he is using the County aid to make his chapter 13 payments.
When cross-examined about his business use of the Vehicle before the accident, Royal admitted the following:
1. He did not submit requests for reimbursement to Newport for the gas, mileage, maintenance and repairs for the Vehicle. He stated, "I did not, because I didn't know I could do that." [Trial Tr. Apr. 11, 2018, Pg. 29:15-18]
*59 2. He did not maintain a personal log of business versus personal miles driven. [ Id. at Pg. 29-23-24]
3. He never presented to either a taxing authority or to Newport any breakdown of the business miles versus the personal miles on the Vehicle. [ Id. at Pg. 29:25-28; 62:22-28; 63:1-8]
4. He did not claim any portion of the Vehicle as a business asset on his 2015 or 2016 tax returns. [ Id. at Pg. 28:28; 29:1-3]
II.
ISSUE
Whether Royal acquired the Vehicle for personal use such that the provisions of 11 U.S.C. § 1325(a)'s Hanging Paragraph apply to prohibit bifurcation and reduction of the SOL's secured claim under 11 U.S.C. § 1325(a)(5)(B)(ii).
III.
LEGAL ANALYSIS
In a chapter 13 case, the debtor bears the burden of proof on each element required for confirmation under section 1325(a). In re Welsh, 465 B.R. 843, 847 (9th Cir. BAP 2012). In this case, Royal proposes to exercise the "cram-down" power under section 1325(a)(5)(B) -that is, bifurcating the secured creditor's debt under 11 U.S.C. § 506(a) into a secured and unsecured debt because the collateral is worth less than the amount of the debt. The amendments to the Bankruptcy Code under BAPCPA, effective October 17, 2005, limited the cram-down power through the addition of a final unnumbered paragraph in section 1325(a) known as the Hanging Paragraph. It added the following text to 1325(a):
For purposes of paragraph (5), section 506 shall not apply to a secured claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for personal use of the debtor....
11 U.S.C. § 1325(a).
It is undisputed that SOL has a purchase money security interest securing a debt that is the subject of its claim; that debt was incurred within 910 days of Royal's bankruptcy; and the collateral for the debt is his motor vehicle. However, Royal contends that the Hanging Paragraph does not apply to SOL's claim because he acquired the Vehicle for his business, rather than personal use.
The term "personal use" is not defined in the Bankruptcy Code. As might be expected, there has been a great deal of litigation over what constitutes "personal use" under section 1325(a). A consensus of courts has construed "personal use" to mean a "non-business use." In re Joseph, 2007 WL 950267, *2 (Bankr. W.D. La. March 20, 2007) ; In re Grimme, 371 B.R. 814, 816 (Bankr. S.D.Ohio 2007) ; In re Lorenz, 368 B.R. 476, 485-86 (Bankr. E.D. Va. 2007). Furthermore, it is uniformly accepted that the debtor's intended use at the time of the vehicle's purchase is the operative intent when determining whether the "Hanging Paragraph" applies to a particular secured claim. In re Phillips, 362 B.R. 284, 302 (Bankr. E.D. Va. 2007) ; In re Solis, 356 B.R. 398, 408-09 (Bankr. S.D.Tex. 2006) ; In re Hill, 352 B.R. 69, 73 (Bankr. W.D. La. 2006). However, it is also widely accepted that the debtor's actual use of the vehicle following the purchase can be persuasive evidence of the debtor's intent at the time of the purchase.
*60 In re LaDeaux, 373 B.R. 48, 51 (Bankr. S.D.Ohio 2007) ; In re Solis, 356 B.R. at 408-09 ; In re Hill, 352 B.R. at 72. There have developed divergent views among the courts as to what constitutes a vehicle acquired for personal use, although most courts claim to be applying one of three variations of a "totality of circumstances" test.
One line of cases has adopted the approach taken in In re Hill, 352 B.R. 69, which considers whether the acquisition of the vehicle "enabled the debtor to make a significant contribution" to the debtor's gross income. In re Martinez, 363 B.R. 525, 527 (Bankr. S.D.Tex. 2007) ; In re Medina, 362 B.R. 799, 802 (Bankr. S.D.Tex. 2007) ( citing In re Johnson, 350 B.R. 712, 716 (Bankr. W.D. La. 2006) ). If it did, then the vehicle was not acquired for the debtor's personal use. In re Hill, 352 B.R. at 73. This line of decisions has been criticized as having "no authority in logic or in the statute" because it allows a vehicle primarily used to satisfy personal needs to escape the restrictions of Section 1325(a) simply because a debtor drives to work in it. In re Solis, 356 B.R. at n. 2 5; see also In re Ozenkoski, 417 B.R. 794, 799 (Bankr. E.D.Mo. 2009).
A second line of cases has adopted the approach taken in In re Solis, 356 B.R. 398, that focuses on whether the personal use by the debtor is significant and material even though it is used for business purposes as well. In re Matthews, 378 B.R. 481, 489 (Bankr. D.S.C. 2007) ; In re Bethoney, 384 B.R. 24, 30 (Bankr. D. Mass. 2008) ; In re Wilson, 2006 WL 3512921, *3 (Bankr. D. Kan. Dec. 5, 2006). Although the Solis court espoused application of the "totality of circumstances" test, the court concluded that "personal use" includes any use of the vehicle "that satisfies personal wants" or "personal needs" such as transportation for recreation, shopping, errands, and commuting. Id at 410. This decision has been criticized as "unreasonable" because "it ignores the fact that, in reality, most business vehicles will occasionally be used to satisfy personal needs." Ozenkoski, 417 B.R. at 799.
The final line of cases has adopted the approach taken in In re Joseph, 2007 WL 950267, at *1, which examines the "totality of circumstances" by engaging in a fact-intensive analysis to determine whether the predominant use of the vehicle is a business or personal use. In re Ozenkoski, 417 B.R. at 799 ; In re Haskins, 2010 WL 1286545, *4 (Bankr. D. Vt. March 25, 2010) ; In re McGinness, 586 B.R. 14, 2018 WL 1162876, *5 (Bankr. E.D. Tenn. March 2, 2018). According to the Joseph court, the factors relevant to determining the "predominate [sic] use of the vehicle include the nature and extent of any personal use of the vehicle, and the relative number of miles that the vehicle is driven for personal versus business uses." In re Joseph, 2007 WL 950267, at *4 (internal quotations omitted). The court went on to explain that the proper inquiry for determining a business use is whether the debtor demonstrates that the vehicle is used to perform the functions of a business or trade. Id. at *3. In other words, does the debtor use the vehicle to carry out his or her duties once at work? Id. The Joseph court identified a number of factors that might assist in such a determination including how the vehicle is used to perform the job duties, whether the vehicle is required by the employer, whether the debtor is reimbursed for vehicle expenses or mileage by the employer, and whether the debtor claims any vehicle-related expenses on his or her tax returns. Id. Additionally, the court considered what the initial retail purchase contract identified as the purpose of the debtor's purchase of the vehicle.
*61 Those courts who follow Joseph's in-depth examination of the "totality of circumstances" seem to arrive at the same conclusion as did the court in Joseph : That is, some occasional personal use of a vehicle does not alter a finding that the vehicle was intended principally for business use. In re Ozenkoski, 417 B.R. at 799 ; see In re McGinness, 586 B.R. 14, 2018 WL 1162876, at *6 ; see also In re Haskins, 2010 WL 1286545, at *5. This Court finds the reasoning of Joseph and its progeny to be persuasive and adopts the "totality of circumstances" as applied in Joseph. This Court agrees with these cases in that if the predominant use of the vehicle is to perform business or trade functions, then incidental personal use will not trigger application of the Hanging Paragraph.
In considering the "totality of circumstances" in Royal's case, although it is close, the Court cannot find that the predominant use of the Vehicle was for business functions. Royal's unrebutted testimony is credible that during the negotiations for purchase of the Vehicle, he emphasized his interest in acquiring a business class vehicle. Without contradiction he testified credibly about being talked out of checking the "business use" box on the retail purchase contract by a salesperson and relied on her "interpretation" of what that paragraph meant.[2]
There are other factors tending to show that the Vehicle may have been a business use vehicle. For example, most afternoons from June to November, 2015, Royal used the Vehicle to drive to appointments with potential candidates or the personal assistants of hiring managers in furtherance of his duties at Newport. Further, it is also notable that while he was at Newport, his employer agreed to help him acquire a vehicle by lending him money for a down payment; albeit it was fashioned as a personal loan for personal use.
On the other hand, however, the Court finds troubling Royal's admissions that he never submitted requests for expense reimbursement for the Vehicle to Newport and that he failed to claim any portion of the Vehicle's expenses or depreciation as a business asset on his tax returns. Royal claims that he did not know he could do that. Royal appeared to the Court to be a well-educated, sophisticated executive recruiter working in industries requiring that he represent himself as knowledgeable to the needs of similarly well-educated people in those industries-oil and gas; aerospace, structural engineering, etc. While working for Newport, he was receiving a draw of $5400 per month against future commission income. It is simply not credible that he was unaware that he could use documented vehicle expenses to reduce his tax obligations on what he must have anticipated was going to be substantial commission income from the placements he would make.
Additionally, other objective factors that would have most strongly suggested that *62 Royal considered the Vehicle a business vehicle are simply missing. Documents such as tax returns and mileage logs evidence the subjective intent of the debtor to use the vehicle for a business use, as well as the debtor's actual use of the vehicle for the intended business purpose. See In re Ozenkoski, 417 B.R. at 800 ("The [Tax] Return suggests [d]ebtor subjectively considered the [v]ehicle a business vehicle."); see also In re McGinness, 586 B.R. 14, 2018 WL 1162876, at *5 (finding a business use where the vehicle was a condition of [the debtor's] employment, used in performing her job and her employer reimbursed her for mileage). Although Royal has established, through unrebutted testimony, that the Vehicle was used for a business use; he has failed to establish that the business use was, in fact, the predominant use of the Vehicle.
There is very little testimonial evidence on the predominant use of the Vehicle. Royal used the Vehicle to commute to his place of business, which is a personal, not a business or profit-making use. See In re Joseph, 2017 WL 950267, at *3. He never kept business versus personal mileage logs that could assist the Court in determining that the personal miles were not the predominant use of the Vehicle. The Court does not know where Royal's place of business was located; the Court does not know where Royal's clients were located; and the Court does not know the nature and extent of his personal use for what was apparently the sole family vehicle.[3] For these reasons, the Court concludes that Royal has failed to carry his burden of proof of showing that the predominant use of the Vehicle was a business use. Accordingly, the Court concludes that the Hanging Paragraph applies, and section 506 may not be used to bifurcate SOL's secured claim.
The Court makes no decision as to the value of the Vehicle despite the expert testimony received on this issue. In light of the Court's findings, determination of the value of the Vehicle is unnecessary.
IV.
CONCLUSION
For the foregoing reasons, SOL's objection to plan confirmation will be sustained and confirmation of this Plan denied. Because under the facts of this case no other chapter 13 plan is feasible without bifurcation, this case is dismissed.

The "Hanging Paragraph" was inserted at the end of Section 1325(a) as a result of the 2005 Amendments to the Bankruptcy Code. This provision precludes the bifurcation of a claim secured by a purchase money security interest in a vehicle purchased within 910 days of a debtor's bankruptcy filing where the vehicle is worth less than the claim at the date of the bankruptcy filing.

The courts have wisely noted that the verbiage of the retail purchase contract is not necessarily dispositive of the debtor's intended use of the vehicle at the time of the purchase, and that the totality of the post-purchase circumstances must be examined. See In re Joseph, 2007 WL 950267, *3-4 (Bankr. W.D. La. March 25, 2010) ; see also In re Ozenkoski, 417 B.R. at 800. The same is true in Royal's case. The retail purchase contract had pre-printed language stating the Vehicle was purchased for personal use, which was contrary to his stated intent. It must be observed that car sellers have a strong incentive to characterize these purchases as made for "personal use," given the benefits conferred by the Hanging Paragraph should a purchaser be unable to perform under the contract and seek refuge in chapter 13 bankruptcy proceedings. For this reason and under the circumstances of this case, the Court gives little weight to the pre-printed language of this contract.

See Trial Tr. Apr. 11, 2018, Pg. 31:1-7.